**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT COOKEVILLE**

| | | |
|---|---|---|
| Dr. JULIA GRUBER, and<br>ANDREW SMITH, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:21-cv-00039 |
| | ) | |
| v. | ) | Judge Crenshaw |
| | ) | Magistrate Judge Newburn |
| TENNESSEE TECH BOARD OF TRUSTEES<br> d/b/a TENNESSEE TECH UNIVERSITY, | ) | |
| DR. LORI BRUCE, in her individual and official | ) | JURY DEMAND |
| capacity, and DR. PHILIP OLDHAM, in his individual | ) | |
| and official capacity, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

## FIRST AMENDED COMPLAINT

---

COMES NOW, the Plaintiffs, Dr. JULIA GRUBER ("Dr. Gruber") and ANDREW SMITH ("Professor Smith") (collectively "Plaintiffs"), and brings suit against the Defendants TENNESSEE TECH UNIVERSITY ("Tennessee Tech" or "Defendant"), DR. LORI BRUCE ("Dr. Bruce"), and DR. PHILIP OLDHAM ("Dr. Oldham"). In support of their Complaint, the Plaintiffs state as follows:

### PARTIES, JURISDICTION AND VENUE

1.     Dr. Julia Gruber lives in Putnam County, Tennessee, and is an Associate Professor of German at Tennessee Tech.

2.     Professor Andrew Smith is a resident of Putnam County, Tennessee, and is a Senior Instructor of English at Tennessee Tech.

3. Defendant Tennessee Tech is a public university doing business in Cookeville, Tennessee.

4. Defendant Board of Trustees is the statutory body which governs the control and management of Tennessee Tech, as provided by Tenn. Code Ann. § 49-8-101 *et seq*.

5. Defendant Dr. Lori Bruce is an employee of Tennessee Tech, who in the scope of her job duties as Provost and Vice President for Academic Affairs, made decisions against the interests of Plaintiffs that violated their First Amendment rights.

6. Defendant Dr. Philip Oldham is an employee of Tennessee Tech, who in the scope of his job duties as President of Tennessee Tech, made decisions against the interests of Plaintiffs that violated their First Amendment rights.

7. Plaintiffs assert claims under 42 U.S.C. § 1983 against Defendants for retaliation in violation of Plaintiffs' Free Speech Rights pursuant to the First Amendment of the United States Constitution, and for violation of Plaintiffs' Procedural Due Process rights pursuant to the Fourteenth Amendment of the United States Constitution.

8. This Court has jurisdiction over the Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331.

9. Venue is proper in the Middle District of Tennessee, pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in Putnam County, Tennessee, and each of the Defendants reside or transact business in the Middle District of Tennessee.

## FACTUAL ALLEGATIONS

### Dr. Julia Gruber

10.     Dr. Gruber is an Associate Professor of German at Tennessee Tech.

11.     Dr. Gruber is a tenured professor who has been working at Tennessee Tech for over 13 years.

12.     Dr. Gruber has received outstanding job evaluations, resulting in consistent pay raises since she started working at Tennessee Tech in 2008.

13.     Because of her outstanding performance, Dr. Gruber has been the highest paid faculty member in her department for years, even though she is not the most senior faculty member.

14.     Dr. Gruber expected to receive another raise in 2021, as well as a $1,000 bonus normally given to faculty who earn a satisfactory evaluation.

15.     In 2020, Dr. Gruber was awarded a Non-Instructional Grant (the "Grant"), which she chose to take in the Spring Semester of 2022.  She had never received this Grant before.

16.     The Grant was awarded to Dr. Gruber after a committee of faculty members selected Dr. Gruber's proposal.  Her proposal focused on bringing African-American and Caucasian women together to discuss female anger at racism and misogyny.

17.     The Grant would have allowed Dr. Gruber to take a semester off from teaching assignments, while being paid her regular monthly income of $5,416.84 (gross) or $3,859.12 (net).

18.     The Grant also provided Dr. Gruber an extra $4,000 to cover conference travel and expenses to host a virtual workshop.

19.     Grants are highly competitive, and only a small number are awarded each year at Tennessee Tech.

20.     Grants are crucial for university professors as they allow them to free their schedules from teaching and service for one semester, to focus on research.

21.     The three main areas that professors are evaluated on each year at Tennessee Tech are teaching, research, and service.

22.     Grants are a key determining factor when deciding which professors receive promotions.

23.     Grants are also given substantial weight when universities make hiring decisions.

24.     After the Grant was approved, Dr. Gruber notified the Coalition of Women in German, an organization she is involved with, that she had been awarded the funds to organize the workshop.

25.     Dr. Gruber has taken Tennessee Tech students to Berlin (and Vienna) for study abroad trips almost every year since 2009.  She was paid for organizing and conducting one of those trips.

26.     Some of her former students have written to her to express how much those trips changed their lives.

27.     Dr. Gruber served as the Faculty Advisor of Tennessee Tech's German Club since 2008.

28.     Additionally, Dr. Gruber also served as the Faculty Advisor of Tennessee Tech's Lambda Gay-Straight Alliance since 2012.

## Professor Andrew Smith

29.     Professor Smith is a Senior Instructor of English.  He is a tenured professor and has worked at Tennessee Tech for approximately 20 years.

30.     Professor Smith has received consistent high evaluations, and merit raises of $1,000 for satisfactory evaluations.

31.     Professor Smith has served as the Faculty Advisor for Tennessee Tech's Chapter of the National Association of the Advancement of Colored People since 2017.

32.     Professor Smith has served as the Faculty Advisor for Tennessee Tech's Underrepresented New and Creative Live Experiences Organization since 2011.

33.     Professor Smith has served as the Faculty Advisor for Tennessee Tech's Presbyterian Student Association since 2014.

34.     Professor Smith served as the Faculty Advisor for Tennessee Tech's College Democrats from 2008 through 2011, and then again since 2020.

35.     Professor Smith served as the Faculty Advisor for Tennessee Tech's Student Environmental Action Coalition from 2010 through 2015, and then again since 2020.

**Andrew Donadio and TPUSA**

36.     Dr. Andrew J. Donadio ("Dr. Donadio") is an Assistant Professor of Nursing at Tennessee Tech.

37.     At all times pertinent hereto, Dr. Donadio served as a Putnam County Commissioner.

38.     At all times pertinent hereto, Dr. Donadio served as Faculty Advisor of the Turning Point USA ("TPUSA") Chapter at Tennessee Tech.

39.     TPUSA is a national organization with chapters on college campuses.

40.     TPUSA, its founder and its members have a history of racism.

41.     Just a few years earlier, an incident occurred on the Tennessee Tech campus where a racially insensitive image and language were used to advertise an event held by the College Republicans, and cosponsored by TPUSA.

42.     This incident was brought up during the January 27, 2021 Administrative Council meeting when the Constitution for Tennessee Tech's TPUSA chapter was approved.

43.     Former TPUSA national field director, Crystal Clanton, was caught saying, "I hate black people. Like fuck them all… I hate blacks. End of story."

44.     A former TPUSA Florida Field Director was filmed while attending TPUSA's 2017 Student Action Summit saying, "The only thing the Nazis didn't get right is that they didn't keep… going!"

45.     The President of a TPUSA chapter at the University of Nevada Las Vegas was caught on video shouting "white power."

46.     A prominent TPUSA leader, Candace Owens, appeared to defend nationalism, saying that, "If Hitler just wanted to make Germany great and have things run well, okay, fine."

47.     The founder of TPUSA, Charlie Kirk, tweeted that its affiliate, Turning Point Action, would be sending more than 80 buses to DC to "fight for the president" and one of the men on those buses was charged with assaulting Capitol police officers during the January 6th Capitol riot.

## The Flyer Calling out Racism

48.     On or about February 4, 2021, Dr. Donadio attended a Putnam County school board meeting to discuss the removal of Algood Middle School's mascot, the "Redskins."

49.     Dr. Gruber was also in attendance.

50.     Dr. Gruber was in favor of changing the mascot due to its racism and insensitivity towards Native Americans.  In fact, there was a Native American family present at the meeting.

51.     Dr. Donadio did not support changing the mascot, and applauded when the decision was made to keep it in place.

52.     Dr. Gruber observed Dr. Donadio's reaction, and discussed it with Professor Smith after the meeting.

53.     Neither Dr. Gruber nor Professor Smith personally knew Dr. Donadio.

54.     Dr. Gruber and Professor Smith researched the background of Dr. Donadio and TPUSA.

6

55.     On or about February 5, 2021, Professor Smith made a flyer (the "Flyer") with a depiction

of Dr. Donadio.  The Flyer read:

> This racist college professor thought it would be a great idea to help start a
> Tennessee Tech chapter for this national hate group, where racist students can
> unite to harass, threaten, intimidate, and terrorize persons of color, feminists,
> liberals, and the like, especially their teachers.  Their organization created a
> national "Professor Watchlist" to harass and intimidate progressive educators,
> including many women, African-American, and Muslim professors. Professor
> Donadio and Turning Point USA. You are on our list. Your hate & hypocrisy are
> not welcome at Tennessee Tech. No unity with racists. Hate speech is not free
> speech.

56.     On or about February 5, 2021, after Professor Smith showed the Flyer to Dr. Gruber, she

decided to distribute copies of it on tables and in the student lounge areas of Bell Hall. An hour

and a half later, she returned to collect them.

57.     That same day, Dr. Donadio filed a police report after being told about the Flyer by an I.T.

worker.

58.     On or about February 6, 2021, Professor Smith distributed copies of the Flyer in the student

union building, Roaden University Center.

59.     On or about February 9, 2021, Dr. Donadio filed a complaint with Defendant's Department

of Human Resources regarding the Flyer.

## The Investigation

60.     On February 24, 2021, Mr. Greg Holt ("Mr. Holt"), Compliance Officer and Interim

Associate Vice President for Human Resources at Tennessee Tech, informed Plaintiffs via letter

that the Office of Human Resources would be conducting a "thorough and impartial investigation" pursuant to Defendant's Policy 141, Prohibited Discrimination and Harassment ("Policy 141").

61.     Policy 141 addresses "unlawful discrimination, harassment… on the basis of race, color, religion, creed, ethnic or national origin, sex, disability, age, veteran status, genetic information, and any other category protected by federal or state civil rights laws.

62.     Per Policy 141, "Upon receipt of a complaint, the Reporting Authority will determine whether the complaint meets the definition of Discrimination, Harassment, or Retaliation as defined [herein]."

63.     Harassment is defined in Policy 141 as "unwelcome conduct based on a protected category."

64.     Discrimination is defined in Policy 141 as "treating a person differently than others based on that individual's legally protected status where such treatment is recognized by statute or regulation as potentially unlawful."

65.     Plaintiffs did not discriminate or harass Dr. Donadio on the basis of his race, color, religion, creed, ethnic or national origin, sex, disability, age, veteran status, or genetic information.

66.     Therefore, Plaintiffs' actions did not meet the definition of Discrimination, Harassment or Retaliation as defined in Section IV of Policy 141.

67.     Policy 141 also insists that "Tennessee Tech **will** maintain the confidentiality of the complaint and the privacy of the persons involved."

68.     The Flyer did not identify either Professor Smith or Dr. Gruber as its creator or distributor.

69.     Plaintiffs' identities became public after TPUSA and Professor Donadio embarked on a media tour to identify and draw attention to Plaintiffs.

70.     As a result of this media tour, Dr. Gruber and Professor Smith have had hate mail dropped off at their home and have received threatening phone calls to their office phones.

71.     As a result of this media tour, Plaintiffs have been mocked and threatened.

72.     Defendant did not maintain the confidentiality of the complaint, nor the privacy of the persons involved.

73.     In a February 24th letter, Defendant also informed Plaintiffs that they were specifically being investigated for alleged violations of Policy 202, Academic Freedom and Responsibility, Section III.D ("Policy 202"); Policy 207, Tenured Faculty, Section VIII.B. ("Policy 207"); and Policy 600, Code of Conduct, Section III.E ("Policy 600").

74.     Section VIII.B of Policy 207 lists various reasons that a tenured professor may be terminated for adequate cause.

75.     In such investigations, Policy 207 assures that "The Office for Human Resources **will** seek expert advice from concerned parties as appropriate, including but not limited to, law enforcement, the Office of Research, deans, chairs/directors, faculty, and university counsel, before reporting its findings to the Provost."

76.     Additionally, "the Provost shall, after conferring with the faculty senate president and the faculty trustee, share the recommendations with the President as to whether the evidence supports a conclusion of a violation of policy/policies… the President shall decide whether the evidence is sufficient to convene a hearing committee to consider whether adequate cause under [this policy] exists."

77.     Policy 207 also ensures that if a hearing is convened, tenured professors are entitled to "a written statement of the specific charges alleged by Tennessee Tech that constitute grounds for

9

termination **and** a notice of hearing specifying the time, date, and place... [and] the right to confront and cross-examine all witnesses."

78.     On March 30, 2021, Professor Smith was notified that two Tennessee Tech students in the TPUSA Chapter at Tennessee Tech had filed complaints against him that were identical to the one filed by Dr. Donadio.

79.     Mr. Holt told Professor Smith that, "I do not think it is necessary to interview you again."

80.     Defendant also did not disclose any details or evidence included in the alleged student complaints other than their names: Gittle Sciolis and Jimmy Stewart.

81.     On April 15, 2021, Defendant notified Professor Smith that the investigation had concluded pursuant to Policy 141. Defendant also provided Professor Smith with an Investigation Memorandum (the "Investigation Memorandum") reporting its findings.

82.     After an investigation, Mr. Holt found, in part, that "the language of the Flyer was intended to harass, intimidate, and threaten Complainants as well as other faculty, staff, and students **whose views and opinions were contrary to those held by Respondents**."

83.     Dr. Claire Stinson ("Dr. Stinson"), Vice President of Planning and Finance at Tennessee Tech, accepted the recommendation of Mr. Holt that, in part, "the language of the Flyer was intended to harass, intimidate, and threaten Complainants as well as other faculty, staff, and students **whose views and opinions were contrary to those held by Respondents**."

84.     The Complainants do not qualify as a protected group under Policy 141.

85.     Tennessee Tech informed Plaintiffs that if they disagreed with the findings of the investigation, they would only have five (5) business days to file a request for reconsideration in writing.

86.     The very next day, Plaintiffs filed a written request for reconsideration that outlined why they believed the factual information and analysis included in the investigation was incomplete, and how the appropriate legal standards were incorrectly applied.

87.     Specifically, Plaintiffs pointed out that Policy 141 does not apply, and that their speech was protected under the First Amendment.

88.     The first request was denied.

89.     Plaintiffs filed a second request for reconsideration of the Investigation Memorandum's findings on April 28, 2021.

90.     That request was also denied.

91.     Plaintiffs were not allowed to address or question witnesses during the investigation.

92.     Plaintiffs were not given a hearing during the investigation to defend themselves against the charges.

93.     Plaintiffs were not given a full and complete record of what evidence was being presented or reviewed during the investigation.

94.     The Investigation Memorandum determined that Plaintiffs "created the Flyer and… distributed the Flyers in Bell Hall where they would be seen by Complainant's students and colleagues," yet provides no evidence from student witnesses who actually saw the Flyer or were allegedly affected by it.

95.     The Investigation Memorandum only cited three (3) pieces of evidence, two of which were copies of the Flyer itself.  The third piece of evidence was Dr. Donadio's police report about the Flyer.

96.     The Background and Evidence sections of the Investigation Memorandum were approximately two (2) pages long.

97. Still, Defendant's investigation determined that based on a "preponderance of the evidence" Plaintiffs had violated Policy 600, Code of Conduct.

98. Policy 600 states that, "Employees are expected to be committed to creating an environment that promotes… diversity, fair treatment, and respect for all faculty, staff, students, and the general public."

99. Plaintiffs' Flyer promoted diversity and fair treatment by speaking out against racism, and various forms of bigotry Plaintiffs believed were espoused by Dr. Donadio and TPUSA.

100. Still, Defendant determined that Plaintiffs' speaking out did not create "an environment that promotes… diversity, fair treatment, and respect for all faculty, staff, students…" but rather, "the content of the Flyer was intended to harass, intimidate, and threaten" Dr. Donadio and others with different views and opinions.

101. No finding explained how the Flyer was intended to harass.

102. No finding explained how the Flyer was intended to intimidate.

103. No finding explained how the Flyer was intended to threaten.

104. No finding was made as to which complainants felt harassed.

105. No finding was made as to which complainants felt intimidated.

106. No finding was made as to which complainants felt threatened.

107. Tennessee Tech's Policy 200, Academic Freedom and Responsibility, Section III.C insists, "When the faculty member speaks or writes as a citizen, he/she should be free from Tennessee Tech censorship or discipline… [as long as the faculty member] make[s] every effort to indicate that he/she does not speak for Tennessee Tech."

108. Plaintiffs did not indicate in any way, shape, or form, that they spoke for Tennessee Tech on the Flyer, nor did they harass, intimidate, or threaten anyone.

109.    By disciplining Plaintiffs, Defendants violated their own policies.

110.    TPUSA has a record of harassing and intimidating others who have different views and opinions.

111.    TPUSA hosts a "Professor Watchlist" website that features a list of college professors who TPUSA believes "advance leftist propaganda in the classroom." The website's self-stated goal is to "expose and document" such professors for their views and opinions.

112.    At the January 27, 2021 Administrative Council meeting when TPUSA's Tennessee Tech chapter was approved, the "Professor Watchlist" was discussed in depth.

113.    Ms. Gittle Sciolis, President of Tennessee Tech's TPUSA chapter, addressed a question about what would happen if one of Defendant's professors were added to the watchlist.

114.    Ms. Sciolis insisted that it was very hard to get on the watchlist, and that a professor would have to be antisemitic or racist against a student to be added.

115.    Vice President of Tennessee Tech's TPUSA chapter, Jimmy Steward, added that a professor would have to be very radical or extreme on multiple occasions to get put on TPUSA's watchlist.

116.    Nevertheless, TPUSA published profiles for both Professor Smith and Dr. Gruber on its Professor Watchlist website.

117.    Dr. Gruber and Professor Smith have had hate mail dropped off at their home.  They have been mocked and threatened.

118.    Tennessee Tech's Policy 007 claims that Defendant "is committed to maintaining a campus as a marketplace of ideas for all Students and Faculty in which the free exchange of ideas is not to be suppressed because the ideas put forth are thought by some or even most members of Tennessee

Tech's community to be offensive, unwise, immoral, indecent, disagreeable, conservative, liberal, traditional, radical or wrong-headed."

119. Tennessee Tech's Policy 007 also claims, "**Tech will not use concerns about civility and mutual respect as justification for closing off the discussion of ideas, however offensive, unwise, immoral, indecent, disagreeable, conservative, liberal, traditional, radical or wrong-headed those ideas may be to some Students or Faculty**."

120. Still, Tennessee Tech only chose to target Plaintiffs for punishment of their ideas.

### Defendants Punish Plaintiffs for Exercising their Free Speech Rights

121. On or about May 13, 2021, Dr. Bruce instituted significant sanctions (the "Sanctions") against Plaintiffs that are currently scheduled to last for two (2) years.

122. The Sanctions strike at the heart of who Dr. Gruber and Professor Smith are as educators.

123. Plaintiffs are banned from serving as Faculty Advisors to any student organization.

124. Dr. Gruber can no longer serve as Faculty Advisor to the German Club or Lambda Gay-Straight Alliance, organizations she had previously been involved with for more than a decade.

125. Professor Smith can no longer serve as Faculty Advisor for the National Association of the Advancement of Colored People, Underrepresented New and Creative Live Experiences, Presbyterian Student Association, College Democrats, and Student Environmental Action Coalition.

126. Plaintiffs are not allowed to participate in study abroad activities or faculty-led trips.

127. Dr. Gruber can no longer take students to Berlin and Vienna as she previously did.

128. Plaintiffs are not eligible to receive non-instructional faculty assignments or awards.

129. Dr. Gruber's hard-earned Grant was revoked as part of these Sanctions.

130.    Dr. Gruber has had to cancel the workshop she planned and will need to take on teaching assignments in the Spring Semester of 2022 to earn her full salary now that the Grant has been revoked.

131.    Plaintiffs are not eligible for salary increases for one (1) year.

132.    Dr. Oldham, the President of Tennessee Tech, unilaterally decided that anyone at Tennessee Tech who had been disciplined in the past year would not be eligible for the $1,000 bonus normally received.

133.    Accordingly, Plaintiffs were both denied a $1,000 bonus in May of 2021 due to the Sanctions and decisions of Dr. Oldham.

134.    The Sanctions will cause Plaintiffs to suffer a decrease in pay that they would not have experienced absent these Sanctions.

135.    Plaintiffs are required to attend meetings so that "personal grievances" are not "brought into the classroom."

136.    Plaintiffs are required to meet with the Dean at the beginning and end of the Fall 2021 semester to discuss their behavior in the classroom.

137.    Plaintiffs will be subject to observation in the classroom.

138.    Dr. Bruce also warned Plaintiffs that "Any further violations by [them]... will result in further disciplinary actions which could include termination of employment."

139.    In determining what punishment to impose, Dr. Bruce only reviewed security videos, the 2-page investigation materials, and interviews from the Plaintiffs and "employee and student complainants."

140. Dr. Bruce also referred to "several public communications [Plaintiffs] made on [the] matter," but only alludes to a letter written by Dr. Gruber to an unidentified local newspaper, and unspecified interviews given on social media.

141. Dr. Bruce also reviewed materials and evidence that were entirely irrelevant and should not have been in Professor Smith's records, when determining what punishment to impose on him.

142. In Dr. Bruce's May 13, 2021 letter to Professor Smith, she referenced a letter of reprimand that had been placed in his personnel file on May 27, 2005, as one of the factors she considered when determining what appropriate punishment should be imposed against Professor Smith.

143. This letter was never presented to Professor Smith in this investigation as evidence to be used against him.

144. Following the incident in 2005, Professor Smith was put on a two-year probationary period, after which he could have the letter of reprimand removed from his file if he met certain conditions required by Defendant.

145. On August 19, 2010, Jack Armistead, Defendant's Provost and VPAA, sent confirmation via e-mail to Human Resources and Professor Smith that the incident from 2005 should be removed from Professor Smith's personnel file.

146. Specifically, Mr. Armistead noted, "Those conditions have been met, and I hereby authorize Human Resources to remove the document from Mr. Smith's file."

147. In spite of written assurances that the letter was removed from his personnel records, Dr. Bruce cited that letter as a crucial piece of evidence used in her determination of what punishment to impose on Professor Smith.

16

148.    Additionally, Dr. Bruce cited a previous incident where Dr. Gruber allegedly violated Defendant's Code of Conduct a few years earlier, following an anonymous student complaint that she misused class time.

149.    The complaint referred to when Dr. Gruber raised concerns with her students after some complained of health issues following Tennessee Tech's switch to using cleaning products that contained pesticides.

150.    However, a report filed by Betsy Smith, an external investigator, with Tennessee Tech's Human Resources Department on January 8, 2020, noted that this incident had been investigated by Mr. Holt.  Mr. Holt previously determined that there was not sufficient evidence to support a finding of a Family Educational Rights and Privacy Act or TTU Policy Violation.  The Provost and President determined that Dr. Gruber did not do anything warranting punishment.

151.    Still, this incident was mentioned as a factor that Dr. Bruce took into account when determining what sanctions to impose on Dr. Gruber.

152.    Finally, Dr. Bruce concluded that Plaintiffs' actions were based on a personal grievance they had with Dr. Donadio, even though neither Dr. Gruber nor Professor Smith knew, or personally knows, Dr. Donadio.

153.    Plaintiffs filed an appeal to Dr. Jennifer Taylor ("Dr. Taylor"), Vice President of the Office of Research and Economic Development at Tennessee Tech, on June 17, 2021.

154.    Dr. Taylor is a Vice President in the Office of Research and Economic Development.

155.    On July 6, 2021, Defendant wrote to Plaintiffs informing them in three sentences that their appeal was denied by Dr. Taylor.

156.    Dr. Taylor did not explain why the appeal was denied.

157.    Dr. Taylor did not address any of the arguments raised in Plaintiff's appeal.

158.    Dr. Taylor simply wrote, "I found that the appropriate TTU policy (Policy 650) was in fact followed and that the disciplinary action was reasonable and appropriate given the record."

## CAUSES OF ACTION

### COUNT I: First Amendment Retaliation Under 42 U.S.C. § 1983

159.    Plaintiff repeat and reallege each and every allegation hereinabove as if fully set forth herein.

160.    The Plaintiffs' Flyer was protected speech under the First Amendment of the United States Constitution.

161.    The Flyer addressed a matter of public concern, rather than a personal grievance.

162.    Plaintiffs were commenting on their perception that Tennessee Tech was tolerating a group, led by Dr. Donadio, with a history of racism.

163.    Plaintiffs were speaking on behalf of the minority students and faculty who they believed to be targeted by TPUSA's views.

164.    Neither Dr. Gruber or Professor Smith personally knew (or knows) Dr. Donadio.

165.    Neither Dr. Gruber or Professor Smith personally knew the student complainants.

166.    Plaintiffs' speech on the Flyer was voiced as private citizens, not pursuant to the Plaintiffs' job duties.

167.    Plaintiffs' speech interests outweigh Defendant's efficiency interest as an employer.

168.    Plaintiffs identities would not have become known but for Defendant Tennessee Tech's investigation as to their identity.

169.    Plaintiffs were speaking as private citizens on a matter of public concern, and the Flyer did not interfere with Defendant's regular operations, nor did it cause a disruption on campus.

170.    The Flyer was only initially seen by a few people.

18

171. The Flyer was not distributed while teaching in the classroom.

172. The Flyer was not sponsored by Tennessee Tech, and Plaintiffs did not speak on behalf of the Defendants.

173. The only publicity and national attention brought to the matter was a result of TPUSA and Dr. Donadio's embarking on a media tour to draw attention to it.

174. Plaintiffs suffered adverse actions intended to chill their speech when Defendants punished them for the aforementioned speech that is protected under the First Amendment of the United States Constitution.

175. Plaintiffs received a written warning accompanied by the threat of termination if their speech continued. Specifically, the May 13* letter that Dr. Bruce sent to Plaintiffs warned them: "The above listed sanctions will remain in place for the next two academic years... Any further violations by you of the employee code of conduct... will result in further disciplinary actions which could include termination of employment."

176. Plaintiffs suffered a decrease in pay when Defendants punished them for their constitutionally protected speech.

177. Plaintiffs have three areas of job responsibilities at Tennessee Tech: teaching, research, and service. As a result of Defendants' Sanctions, Plaintiffs have essentially had two of those three areas (research and service) severely restricted.

178. Dr. Bruce, while acting in her individual and official capacity, acted under the color of state law when she instituted Sanctions against Plaintiffs in retaliation for the aforementioned speech that is protected under the First Amendment of the United States Constitution.

179.    Dr. Oldham, while acting in his individual and official capacity, acted under the color of state law when he revoked Plaintiffs' bonus due to Defendant's punishment of the aforementioned speech that is protected under the First Amendment of the United States Constitution.

180.    The constitutionally protected speech was the motivating factor for Defendants' decision to discipline and punish Plaintiffs.

181.    By depriving Plaintiffs of their constitutional rights, Defendants violated 42 U.S.C. § 1983.

## COUNT II: Denial of Procedural Due Process in Violation of the Fourteenth Amendment and 42 U.S.C. § 1983

182.    Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

183.    As tenured professors, Plaintiffs have a property interest in their continued employment that is protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

184.    Plaintiffs also have a property interest in Tennessee Tech complying with its own policies, which is protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

185.    Defendants, via their policies and procedures, did not provide Plaintiffs with a meaningful opportunity to be heard before depriving them of their protected property interests.

186.    Defendants did not allow Plaintiffs to cross examine or even write written questions to any complainant, despite the fact that credibility was an issue.

187.    Defendants did not provide Plaintiffs with a full record to allow them to rebut accusations.

188.     Defendants did not provide Professor Smith with the May 13, 2021 letter of reprimand that was used as evidence against him in the investigation for the flyer.

189.     Defendants did not provide Dr. Gruber with the earlier student complaint about her alleged misuse of class time that was later used as evidence against her in the investigation for the flyer.

190.     Defendants acted under the color of state law when they deprived Plaintiffs of their protected property interests.

191.     As a result of Defendants' conduct, Plaintiffs have suffered and will suffer loss of earnings, job experience, and benefits that they would have enjoyed absent such conduct.

192.     By depriving Plaintiffs of their constitutional rights, Defendants violated 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

1.     That the Court declare that Defendants violated 42 U.S.C. § 1983;

2.     That the Court permanently enjoin Defendants from violating Plaintiffs' rights or grant them other equivalent equitable relief, including monetary losses, and order Defendants to revoke all of the Sanctions imposed on Plaintiffs and reinstate Plaintiffs to their full teaching duties;

3.     An award of attorneys' fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988;

4.     Such other legal or equitable relief as this Court deems appropriate.

Respectfully Submitted this 23rd day of November, 2021,

/s Robert C. Bigelow
Robert C. Bigelow, Esq. (Bar #022022)
BIGELOW LEGAL, P.L.L.C.
4235 Hillsboro Pike, Suite 301
Nashville, Tennessee 37215
(615) 829-8986
rbigelow@bigelowlegal.com

*Attorney for Plaintiffs*