# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

DR. JULIA GRUBER AND      )
ANDREW SMITH,              )
                                )
        **Plaintiffs,**       )
                                )
     **v.**                  )      **No. 2:21-cv-00039**
                                )
DR. LORI BRUCE,            )
**in her official and individual capacity,**  )
                                )
        **Defendant.**       )

## <u>MEMORANDUM OPINION</u>

An internecine difference of opinion among academics at Tennessee Tech University ("TTU" or "Tech") led to this action under 42 U.S.C. § 1983 asserting First Amendment retaliation and Fourteenth Amendment due process claims. The case arose after two faculty members were disciplined by the Provost for distributing flyers on campus that labeled another faculty member a racist. Now before the Court are fully-briefed Cross-Motions for Summary Judgment. (Doc. Nos. 60, 61, 62, 65-71, 78-83, 84, 87, 88).[1] For the reasons that follow, the Defendant's Motion for

---

[1] The sheer volume of filings prompts two observations. First, the number of filings is due largely to Defendant filing two Motions for Summary Judgment, one in her individual capacity and the other in her official capacity. The filings relating to both motions are virtually (if not) identical, including the memoranda in support (Doc. Nos. 80-1, 81-1), the responses and replies (Doc. Nos. 82, 83, 87, 88), and the statements of facts and responses (67, 68, 82, 83). Additionally, the same 22 exhibits spanning more than 1600 pages are filed twice. This is a first for the Court and entirely unnecessary. Defendant could have simply filed one motion and one memorandum that incorporated both her individual and official capacity arguments particularly because her qualified immunity argument is only 2½ pages long (Doc. No. 66 at 28-30), and leave of Court was given to file those extra pages. (Doc. No. 70).

Second, the Local Rules provide that reply briefs "shall not exceed five (5) pages without leave of Court." L.R. 7.01(A)(4). It is not lost on the Court that, while Defendant's two replies are exactly 5 pages long, this is only because each contains an identical, single-space, small font, footnote that begins on page one, takes up the majority of page two, and concludes on page three. Counsel are reminded that it is incumbent upon them "to follow the letter – if not the spirit" of the rules. <u>Nash v. Comm'r of Soc. Sec. Admin.</u>, No. 3:20-CV-00908, 2022 WL 1174096, at *2 (M.D. Tenn. Apr. 20, 2022).

Summary Judgment will be granted and Plaintiffs' Motion will be denied.

## I. <u>Factual Background</u>[2]

Dr. Julia Gruber is a tenured Associate Professor of German at TTU, while Mr. Andrew Smith is a tenured Instructor in the Department of English at that institution. (PSOF ¶¶ 1, 2). Dr. Lori Bruce is the Provost at TTU and Vice President for Academic Affairs. (Doc. No. 56-9, Bruce Dep. at 22).

In 2021, a student chapter of Turning Point USA ("TPUSA") was established at TTU. TPUSA s is a national organization with a presence at many college campuses across the United States. It came to TTU after Gittle Sciolis, a student at the school, filed a petition to make TPUSA a student club. Ms. Sciolis has described the club as a "conservative organization for college students [and] high school students" with a mission "to spread conservative ideas." (PSOF ¶¶ 17-19). For their part, Plaintiffs believe that TPUSA is a racist organization and "national hate group" with "ties to white supremacy." (<u>Id.</u> ¶ 20). Dr. Andrew Donadio ("Dr. Donadio"), a County Commissioner and an Assistant Professor of Nursing, serves as TPUSA's faculty advisor at TTTU. (<u>Id.</u> ¶ 3).

On February 4, 2021, the Putnam County School Board held a meeting to consider whether a committee should be appointed to look into the issue of whether Algood Middle School's mascot should be renamed from "Redskins" to something else. (<u>Id.</u> ¶ 4). Dr. Gruber attended the meeting with some friends, including Sayota Knight, who Plaintiffs claim is Native American. (<u>Id.</u> ¶ 5).

---

[2] The following facts are drawn from Plaintiffs' Statement of Undisputed Facts ("PSOF") (Doc. No. 62) and Defendant's Response (Doc. No. 79) thereto, as well as from Defendant's Statement of Undisputed Facts ("DSOF") (Doc. No. 71) and Plaintiffs' Response thereto (Doc. No. 72). Contrary to what those lengthy documents might suggest and Defendant's penchant for picking apart virtually every statement made by Plaintiffs, the important and relevant facts are not in much dispute.

Dr. Donadio also attended the meeting. Even though he understood that some people found "Redskins" to be a racial slur, he cheered and applauded when the Board voted against forming a committee to determine whether the "Redskins" mascot should be retired. (Id. ¶¶ 9, 10). Witnessing Dr. Donadio's enthusiastic support for the Board's decision, Dr. Gruber was "shocked" and "offended." (Id. ¶ 12). She also felt that Dr. Donadio's behavior was "intimidating" to her Native American friend because it was "racist." (DSOF ¶ 4).

That same evening, Dr. Gruber contacted Mr. Smith by Facebook Messenger, and informed him about what she had witnessed. Upon hearing Dr. Donadio's reaction, Mr. Smith, too, became upset and dismayed. (PSOF ¶ 13).

Dr. Donadio's reaction to the Board's decision to shelf the issue about renaming the "Redskins," coupled with his role as the faculty advisor to TPUSA, incensed Plaintiffs and prompted Mr. Smith to create the flyer that is at the heart of this lawsuit. Before discussing that flyer and its aftermath, a little background about TPUSA and its arrival at TTU is appropriate.

As noted, Plaintiffs view TPUSA as a racist organization with "a history of political and racial controversy" surrounding it. (Id. ¶ 27). They point out that "[b]efore TPUSA had an official student chapter at TTU, in the fall of 2019, TPUSA co-sponsored a campus event with the College Republicans in which an advertisement was made for a debate watch party, featuring (then-Presidential Candidate) Senator Elizabeth Warren dressed up in Native American dress, alongside derogatory comments." (Id. ).

TPUSA's intention to establish a chapter at TTU was disconcerting to some and received significant push-back. One concern was that the organization has a Professor Watchlist website, which publishes profiles of college professors, and has the stated mission to "expose and document

3

college professors who discriminate against conservative students and advance leftist propaganda in the classroom." (Id. ¶ 23). Provost Bruce viewed the watchlist as "an effort to single out individuals for the purpose of harassing them." (Id. ¶ 24). Indeed, she and other academics had expressed concerns about how a professor would end up on the watchlist even before the organization arrived on campus. (Id. ¶ 25).

The idea of maintaining a watchlist seemingly played into a portion of the flyer created by Mr. Smith. That flyer begins by stating:

> This racist college professor thought it would be a great idea to help start a Tennessee Tech chapter for this national hate group, where racist students can unite to harass, threaten, intimidate, and terrorize persons of color, feminists, liberals, and the like, especially their teachers. Their organization created a national 'Professor Watchlist' to harass and intimidate progressive educators, including many women, African-American, and Muslim professors.

This statement is followed by a large picture of Dr. Donadio sitting in a chair. After the picture, the flyer concludes with the following text:

**Professor Donadio and Turning Point USA. You are on our list.**
**Your hate & hypocrisy are not welcome at Tennessee Tech.**

**No Unity With Racists. Hate Speech Is Not Free Speech.**

(Doc. No. 52-4).[3] The flyer was created by Mr. Smith at home using his own personal software. (PSOF ¶ 33).

Around 3:30 p.m. on February 5, 2021, Dr. Gruber placed a handful of flyers in the lounge, the auditorium (where Dr. Donadio sometimes taught classes), the kitchen, and in common areas of Bell Hall. (DSOF ¶ 8). Frank Sterling, an IT employee at the school found at least some of those

---

[3] A copy of the flyer is attached hereto as "Exhibit A."

4

flyers and collected them. (PSOF ¶ 36; DSOF ¶¶ 10, 11). He also sent a picture of the flyer to Dr. Donadio who, in turn, sent it to Ms. Sciolis. (PSOF ¶ 39). Dr. Donadio reported the incident to the University Police Department, and a police report was written that same day, listing the "incident type" as "harassment." (Doc. No. 72-2 at 183).

The next afternoon at around 1:20, Mr. Smith posted a flyer in the Roaden University Center ("RUC"). (PSOF ¶ 37). Two days later, on February 8, 2021, the flyer was seen by Reece Arnold, a student, and reported to campus police, who then removed it. (Id. ¶ 41).

The record suggests that the flyer was not seen by many others and there is nothing to suggest that classes at TTU were canceled or rescheduled as a result of the flyer. (Id. ¶¶ 44-45). Nevertheless, and even though he would later tell the media that he was an elected official and could "take the heat," Dr. Donadio filed a formal complaint on February 9, 2021 with TTU's Office of Human Resources against Dr. Gruber and Mr. Smith. (Doc. No. 62-14 at 2; PSOF ¶ 56). Both were notified of Dr. Donadio's complaint on February 24, 2021. (PSOF ¶ 48).

An investigation was conducted by Greg Holt, Compliance Officer and Interim Associate Vice President of Human Resources. (Doc. No. 80-8 at 2). His investigation lasted until April 14, 2021. (Id.).

On April 25, 2021, Dr. Donadio and Ms. Sciolis gave an interview on the Fox Television News show Fox & Friends, where they discussed the flyer, the university's disciplinary process, and the political tensions surrounding TPUSA's presence on campus. (Id. ¶ 51). Plaintiffs claim that, after the interview, they were placed on TPUSA's Professor Watchlist. (Id. ¶ 59). They also claim that they received a number of "hate mail" messages in both their emails and voicemail, and some such messages were sent directly to the University via its "Contact Us" form. (Id. ¶¶ 59,60).

Public opinion about Plaintiffs' actions and Dr. Donadio's reaction was not unanimous, however. For example, Alex Sloan, an alumnus, voiced the opinion that Dr. Donadio went on a "public smear campaign," and that the "inflammatory violent propaganda targeting professors [was] wildly inappropriate and should be concerning to all academics[.]" (Id. ¶ 62).

After Holt completed his investigation, he determined that "[t]he preponderance of the evidence supports the conclusion [Plaintiffs] violated Tennessee Tech Policy 600, Code of Conduct." (Doc. No. 62-14 at 5). That policy, in pertinent part, reads:

> 1. In carrying out Tennessee Tech's educational, research, and public service missions, Tennessee Tech relies on the ethical and responsible conduct of all employees. Employees are expected to conduct themselves fairly, honestly, in good faith, and in accordance with the highest ethical and professional standards and to comply with applicable laws, regulations, contractual obligations, and Tennessee Tech policies.
>
> 2. Employees are expected to be committed to creating an environment that promotes academic freedom, diversity, fair treatment, and respect for all faculty, staff, students and the general public.
>
> *                    *                    *
>
> 4. Employees are expected to maintain the highest levels of integrity and objectivity as they perform their duties. As such, employees are expected to take all reasonable precautions and seek appropriate guidance to ensure their outside interests do not place them in conflict with carrying out their duties and responsibilities to Tennessee Tech[.]

(Doc. No. 62-23 at 2-3).

In an email dated April 16, 2021 to Provost Bruce, Holt attached his report and stated that Claire Stinson, Vice President of Planning and Finance, "concurred in [his] findings and recommendations[.]" (Id. at 1). Holt also noted, however, that Plaintiffs had five days to request reconsideration, otherwise "the Vice President's decision becomes final." (Id.). Through counsel,

6

both Plaintiffs' moved for reconsideration, but the requests were denied. (DSOF ¶ 26). Accordingly, Vice President Stinson forwarded the matter to Provost Bruce for discipline.

In determining appropriate discipline, Provost Bruce interviewed Plaintiffs, Dr. Donadio, and Ms. Sciolis. She also reviewed TTU's policies and consulted with university legal counsel. (Id. ¶¶ 28, 30). Dr. Bruce came to the conclusion that the purpose of the flyer "was to target one individual, a coworker, and a small group of students to threaten and harass and intimidate them, [and] to incite others to participate in the harassment[.]" (DSOF ¶ 30). Provost Bruce also believed that, in the university setting, "every employee is entitled to their own opinions and thoughts" but "if those viewpoints start to then impinge on the rights of other [students], they start mistreating others because of those viewpoints, they start taking actions that are based on those viewpoints that are inappropriate actions, then it becomes a concern" for the university. (Id. ¶ 33). Indeed, Dr. Donadio in his deposition testified that he viewed the flyer as a threat, and Ms. Sciolis told Provost Bruce that, because of the flyer and the anxiety it caused, she missed class. (DSOF ¶¶ 34, 35; Doc. No. 56-9, Bruce Dep. at 60; Doc. No. 56-14, Donadio Dep. at 123-125).

In imposing discipline, Provost Bruce considered the possibility of revoking tenure in accordance with TTU's Policy 207. She decided against that route after consulting with the Faculty Senate President and Faculty Trustee. (DSOF ¶ 38). Instead, she imposed discipline upon both Plaintiffs for violating Policy 600 as referenced previously, and Policy 007 pertaining to "Free Speech on Campus" that provides:

> Tennessee Tech is committed to maintaining a campus as a marketplace of ideas for all Students and Faculty in which the free exchange of ideas is not to be suppressed because the ideas put forth are thought by some or even most members of Tennessee Tech's community to be offensive, unwise, immoral, indecent, disagreeable, conservative, liberal, traditional, radical, or wrong-headed.

(Doc. No. 81-17 at 3).

Plaintiffs were informed of Provost Bruce's decision by letter dated May 13, 2021. In it, they were told that discipline was imposed as a result of "your actions, not your beliefs or ideas"; and "your attempts to harass, intimidate, and/or threaten another employee and a small group of students on campus students [sic] whose views and opinions were contrary to your own." (Id.). The discipline included Plaintiffs being (1) not permitted to serve as a faculty advisor to any student organizations; (2) not allowed to participate in study abroad activities; (3) ineligible for non-instructional faculty assignments; and (4) ineligible for salary increases for a year. Additionally, both were required to meet with the Dean of the College of Arts and Sciences (or his or her designee) at the start of each semester "to reinforce with you the importance of not bringing personal grievances into the workplace." (Id. at 2-3). Plaintiffs were also required to complete sensitivity training. (Id.).

## II. Legal Discussion

Mr. Smith's flyer called Dr. Donadio a racist. Words have meaning and college language teachers should understand that better than most. Perhaps, however, Dr. Gruber and Mr. Smith are clever by half because, at least according to some:

> Accusations of "racism" no longer are "obviously and naturally harmful". The word has been watered down by overuse, becoming common coin in political discourse. . . . Formerly a "racist" was a believer in the superiority of one's own race, often a supporter of slavery or segregation, or a fomenter of hatred among the races. . . . Politicians sometimes use the term much more loosely, as referring to anyone (not of the speaker's race) who opposes the speaker's political goals—on the "rationale" that the speaker espouses only what is good for the jurisdiction (or the audience), and since one's opponents have no cause to oppose what is beneficial, their opposition must be based on race. The term used this way means only: "He is neither for me nor of our race; and I invite you to vote your race." . . . That may be an unfortunate brand of politics, but it also drains the term of its former, decidedly opprobrious, meaning. . . .

8

> Language is subject to leveling forces. When a word acquires a strong meaning it becomes useful in rhetoric. A single word conveys a powerful image. When plantation owners held blacks in chattel slavery, when 100 years later governors declared "segregation now, segregation forever", everyone knew what a "racist" was. The strength of the image invites use. To obtain emotional impact, orators employed the term without the strong justification, shading its meaning just a little. So long as any part of the old meaning lingers, there is a tendency to invoke the word for its impact rather than to convey a precise meaning. We may regret that the language is losing the meaning of a word, especially when there is no ready substitute.

Stevens v. Tillman, 855 F.2d 394, 402 (7th Cir. 1988).

The observations in Stevens are almost thirty-five years old. Matters have only gotten worse since then, undoubtedly to the dismay of English language purists. In many walks of life, including academia it seems, civility and professionalism have taken a backseat to unnecessary discord and divisiveness, with terms like "racist" being bandied about with reckless abandon. "But we serve in a court of law rather than of language and cannot insist that speakers cling to older meanings." Id. Nor can a court legislate sensible behavior.

What the Court can and must do is determine whether a genuine issue of material fact exists on Plaintiffs' First Amendment retaliation or Fourteenth Amendment due process claims and whether either side is entitled to judgment as a matter of law. If there remains a jury question on a claim, the question then becomes whether Defendant is entitled to qualified immunity.[4]

---

[4] The Court analyzes these issues sequentially because, to overcome the qualified immunity defense, plaintiffs must establish that (1) "based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred," and (2) "the violation involved a clearly established constitutional right of which a reasonable person would have known." Sample v. Bailey, 409 F.3d 689, 695-96 (6th Cir.2005); see also Saucier v. Katz, 533 U.S. 194, 201 (2001). Although "the court may address these prongs in any order . . . if the plaintiff cannot make both showings, the offic[ial] is entitled to qualified immunity." Brown v. Lewis, 779 F.3d 401, 412 (6th Cir. 2015) (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)). Hence, if "no constitutional violation occurred, the Court need not address [the parties'] arguments regarding qualified immunity." Fox v. Corrigan, 161 F. App'x 522, 526 (6th Cir. 2005); see also Criss v. City of Kent, 867 F.2d 259, 261 (6th Cir. 1988) (observing that if "no constitutional violation occurred . . . the court would never reach the qualified immunity question").

9

## A. First Amendment Retaliation

"[T]he Free Speech Clause applies at public universities" and "[t]hus, the state may not act as though professors or students 'shed their constitutional rights to freedom of speech or expression at the [university] gate.'" Meriwether v. Hartop, 992 F.3d 492, 503 (6th Cir. 2021) (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969)). Nevertheless, "free-speech rules apply differently when the government is doing the speaking [and] that remains true even when a government employee is doing the talking." Id. at 503-04.

The basic free-speech rules for public employees were laid out by the Supreme Court in Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968), Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977), and Connick v. Myers, 461 U.S. 138, 147–50 (1983). In Pickering, the Court established a two-part test, requiring the employee to show first that his or her speech addressed "matters of public concern," and second that his or her interest "in commenting upon matters of public concern" outweighed "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.

Mt. Healthy added a causation element to Pickering pursuant to which the employee must show that his or her constitutionally-protected conduct was a "substantial" or "motivating" factor in the imposition of discipline. Mt. Healthy, 429 U.S. at 287. If that showing is made, the employer can still escape liability if it shows "by a preponderance of the evidence that [it] would have reached the same decision ... even in the absence of the [plaintiff's] protected conduct." Id.

Finally, in Connick, the Court refined the Pickering test by holding that "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without

10

intrusive oversight by the judiciary in the name of the First Amendment." Connick, 461 U.S. at 146. Effectively, "Connick erected a dichotomy between citizens speaking on matters of public concern and employees speaking on matters only of personal interest[.]" Scarbrough v. Morgan Cty. Bd. of Educ., 470 F.3d 250, 256 (6th Cir. 2006).

Taken together, these three case means that, in order to establish a claim for First Amendment retaliation, Plaintiffs, as public employees, must show that (1) they engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against them that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by his protected conduct. Myers v. City of Centerville, 41 F.4th 746, 759 (6th Cir. 2022); Bennett v. Metro. Gov't of Nashville & Davidson Cnty., 977 F.3d 530, 537 (6th Cir. 2020). Dr. Bruce insists that Plaintiffs have not established any of the elements of a *prima facie* case. In doing so, she advances several arguments, a couple of which border on the fanciful.

### 1. *Speech of a Public Employee Versus Speech as a Private Citizen*

Dr. Bruce first argues that Plaintiffs spoke as employees of TTU when distributing the flyers. If so, this would exonerate the university from liability because "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." Garcetti v. Ceballos, 547 U.S. 410, 442 (2006). Because the government "has a broad right to control" its own speech, the "employer[] may discipline the employee[] for saying something unacceptable because this speech is effectively the government[.]" DeCrane v. Eckart, 12 F.4th 586, 595 (6th Cir. 2021) (citing Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009)).

11

Sometimes, however, "it can be unclear whether an employee spoke while wearing a 'public' or 'private' hat." Id. at 595. In "decid[ing] whether expression falls within the public or private bucket," a court may be called upon to answer a number of questions, such as "What was the 'impetus' for or 'motivation[ ]' behind the speech?"; "What was the speech's setting?"; and "Who was the speech's audience?" Id. at 595-96 (citations omitted).

The Court finds it unnecessary to answer such inquiries here because, to support the argument that Plaintiffs were speaking as employees, Dr. Bruce relies upon deductive reasoning involving leaps the Court is unwilling to take. Specifically, she asserts that a teacher's job is to teach; the goal of the flyer was to educate; the flyer was placed in a university building during business hours; ergo, Plaintiff's action "is identical to that of a professor engaging in his or her professional teaching responsibilities." (Doc. No. 70 at 10). Not so.

"The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lane v. Franks, 573 U.S. 228, 240 (2014). Further, after the Supreme Court's decision in Lane, "the Garcetti exception to First Amendment protection for speech residing in the phrase 'owes its existence to a public employee's professional responsibilities' must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his [or her] employment." Boulton v. Swanson, 795 F.3d 526, 534 (6th Cir. 2015). Making and surreptitiously dropping-off anonymous flyers to unknown recipients was neither an official duty nor a professional responsibility of either Plaintiff.

### 2. *Adverse Action*

Dr. Bruce also argues that Plaintiffs have not established the second element of a retaliation claim because the "nominal sanctions" imposed "would not chill the speech of an ordinary person."

12

(Doc. No. 70 at 19).  As she correctly points out, "[t]he term 'adverse action' has traditionally referred to actions such as 'discharge, demotions, refusal to [h]ire, nonrenewal of contracts, and failure to promote.'" Handy-Clay v. City of Memphis, 695 F.3d 531, 545 (6th Cir. 2012) (citations omitted).  However, the Sixth Circuit has also recognized that a court is "required to tailor[] [its] analysis under the adverse action prong to the circumstances of the specific retaliation claim" at issue. Dye v. Off. of the Racing Comm'n, 702 F.3d 286, 303 (6th Cir. 2012) (citation omitted).

"The term 'adverse action' arose in the employment context" and generally envisions a material change in employment status or benefits like those just mentioned.  Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 724 (6th Cir.2010).  Under the First Amendment, in contrast, an adverse action is one that would 'likely chill a person of ordinary firmness from continuing to engage in that activity,'" Ryan v. Blackwell, 979 F.3d 519, 525 (6th Cir. 2020) (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999)). This may include such things as "'harassment or publicizing facts damaging to a person's reputation." Id. (quoting, Fritz, 592 F.3d at 724).

Notably, the harassment necessary to rise to a level sufficient to deter an individual is 'not extreme.'" Perkins v. Twp. of Clayton, 411 F.App'x 810, 814 (6th Cir. 2011) (citing Siggers–El v. Barlow, 412 F.3d 693, 701 (6th Cir.2005)); see also Bloch v. Ribar, 156 F.3d 673, 679 (6th Cir. 1998) (citation omitted) ("The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable.").  For purposes of a First Amendment retaliation claim, therefore, unless the adverse action is "de minimus" or "inconsequential," the issue of "whether an alleged adverse action is sufficient to deter a person of ordinary firmness is generally a question of fact." Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583–84 (6th Cir. 2012).

13

This Court cannot conclude, as a matter of law or fact, that being prohibited from (1) serving as a faculty advisor; (2) participating in studies abroad; and (3) receiving no non-instructional faculty assignments or a salary increase for a year, while at the same time being required to (4) meet with the Dean yearly; and (5) undergo sensitivity training would not deter others from engaging in protected conduct. Summary judgment is not appropriate based upon a supposed lack of an adverse action.

### 3. *Causal Connection*

Dr. Bruce further argues that the content of the flyer had nothing to do with the punishment imposed and, hence, she has rebutted the causal connection necessary to establish the third element. After all, she wrote in her letter to each Plaintiff that "The disciplinary action in this matter are a result of your actions, not your beliefs or ideas," and she reiterated as much in her deposition. (Doc. No. 70-7 at 44, 92 & Eh. 7, 8). "The employer's rebuttal involves 'issues of fact,' however, and may not be decided on a motion for summary judgment unless the evidence 'is so one-sided that one party must prevail as a matter of law.'" Cherry v. Pickell, 188 F. App'x 465, 69 (6th Cir. 2006) (quoting Leary v. Daeschner, 349 F.3d 888, 898 (6th Cir.2003)). Dr. Bruce's self-serving statements to the side, query whether, as Plaintiffs suggest, the same sanctions would have been imposed had the flyer told the reader about "a Hot Dog Eating Contest," or expressed the opinion that "Pralines & Cream Ice Cream is better than Vanilla." (Doc. No. 84 at 4). At a minimum, this presents a factual question making summary judgment inappropriate.

### 4. *Constitutionally Protected Speech and Balancing Interests*

Left for consideration is the first element of a retaliation claim, to wit, whether Plaintiffs engaged in constitutionally protected speech or conduct. This inquiry contains two "sub-elements":

14

(1) whether the statement in question constitutes speech on a matter of public concern; and (if so) (2) whether the plaintiffs interest in making such speech outweigh the employer's interest "in promoting the efficiency of the public services it performs through its employees." Ryan, 979 F.3d at 526 (citing Leary, 228 F.3d at 737). Again, Dr. Bruce insists Plaintiffs have met neither element.

With respect to the first sub-element, Dr. Bruce argues that the speech at issue was not a matter of public concern because the flyer was the result of a personal grievance Plaintiffs had with Dr. Donadio. Alternatively, she argues they had a "beef" with the school and that is why they spoke. The Court is unpersuaded by either argument.

Since at least Connick, the Supreme Court has instructed courts not to "constitutionalize" employee grievances, 461 U.S. at 154, 103 S.Ct. 1684, so as to avoid "compromis[ing] the proper functioning of government offices." City of San Diego v. Roe, 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004). "[T]he quintessential employee beef [is that] management has acted incompetently." Handy-Clay, 695 F.3d 531, 540–41 (6th Cir. 2012). Similarly, interpersonal squabbles – not being matters of public concern – are not constitutionally protected. See Naghtin v. Montague Fire Dist. Bd., 674 F. App'x 475, 479 (6th Cir. 2016); Mosholder v. Barnhardt, 679 F.3d 443, 449–50 (6th Cir. 2012).

As a personal matter, Plaintiffs were not pleased that Dr. Donadio applauded the school board's decision not to consider changing the name of the mascot at Algood Middle School. And, as faculty members, they were not happy that TTU allowed TPUSA onto campus. These undisputed facts do not mean, perforce, that theirs was simply a personal or employment grievance and not a matter of public concern.

"Whether an employee's speech addresses a matter of public concern must be determined

by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-148. Speech which can be "fairly considered as relating to any matter of political, social, or other concern to the community" touches upon matters of public concern. Id. "While motive for the speech is a relevant factor, . . . the pertinent question is not why the employee spoke, but what he said," meaning that a court must "examine the point of the speech in question[.]" Myers, 41 F.4th at 760.

The point of the flyer was to call out Dr. Donadio as a racist and to identify TPUSA (rightly or wrongly) as a racist organization. Certainly, identifying and addressing racism on college campuses is a matter of public concern. See Connick, 461 U.S. at 148 at n.8 (noting that the "right to protest racial discrimination" is "inherently of public concern"); Hardy v. Jefferson Cmty. Coll., 260 F.3d 671, 679 (6th Cir. 2001) (observing that "race, gender, and power conflicts in our society" are "matters of overwhelming public concern"); McLin v. Bd. of Police Comm'rs, 10 F. App'x 388, 389 (8th Cir. 2001) ("Assuming it is not related entirely to a private dispute between the plaintiff and defendant, racism in a public agency is inherently a matter of public concern.").

Whether Plaintiffs' allegations about Dr. Donadio and TPUSA are true or not the Court does not know and, at this point in the analysis, is irrelevant. See v. City of Elyria, 502 F.3d 484, 493 (6th Cir. 2007). What is relevant is that the speech "touched upon" a matter of public concern, even if the motive for the speech was mixed.

"'If any part of an employee's speech, which contributes to the [disciplinary action], relates to a matter of public concern, the court must conduct a balancing of interests test as set forth in Pickering[.]'" See Bonell v. Lorenzo, 241 F.3d 800, 812 (6th Cir. 2001) (quoting Rahn v. Drake Ctr., Inc., 31 F.3d 407, 412 (6th Cir.1994)). Plaintiffs' disagreement with Dr. Donadio and the group

he led was not merely personal, nor was it a quotidian workplace grievance. Accordingly, it is to the that balancing test that the Court now turns.

Balancing interests must begin with the fundamental notion that there is a "robust tradition of academic freedom in our nation's post-secondary schools." Hardy, 260 F.3d at 679. Indeed, the Supreme Court has "long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." Grutter v. Bollinger 539 U.S. 306, 329 (2003). Because "a professor's rights to academic freedom and freedom of expression are paramount in the academic setting," Bonnell, 241 F.3d at 823, "professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship." Meriwether, 992 F.3d at 505.

The paeans to academic freedom and free speech do not give faculty members a license to violate university rules without consequences, however. "It goes without saying that a university has an interest in fostering a collegial educational environment while doing everything within its power to maintain its reputation in the academic community both on campus and around the nation." Trejo v. Shoben, 319 F.3d 878, 888 (7th Cir. 2003); See also Bonnell, 241 F.3d at 822 ("A college's or university's interest in maintaining a hostile-free learning environment . . . is well recognized."). Hence, the First Amendment does not require public employers to tolerate every type of personal attack against others, even when the attack touches upon a matter of public concern. Instead, "[i]f the manner and content of an employee's speech is demeaning, disrespectful, rude, and insulting, and is perceived that way in the workplace, the government employer is within its discretion to take disciplinary action." Shi v. Montgomery, 679 F. App'x 828, 835 (11th Cir. 2017). See also Munroe

v. Cent. Bucks Sch. Dist., 805 F.3d 454, 472 (3d Cir. 2015), (citation omitted) (observing that "the government's legitimate and countervailing interest, as an employer, in promoting workplace efficiency and avoiding workplace disruption" may tip the Pickering scale); Isibor v. Bd. of Regents of State Univ. & Cmty. Coll. Sys. of Tenn., 891 F.2d 290 (6th Cir. 1989) (stating that "[c]omments which adversely affect close working relationships or disrupt the maintenance of discipline or cause disharmony among coworkers may tip the balance in a defendant's favor") .

Even if the term has been watered down over the years, calling a colleague a racist is hardly collegial, and threatening to place him and the group he advises on a "list" is no better. Moreover, like other institutions of higher learning, TTU has rules that need to be followed in order for the institution to fulfill its educational mandate and mission. It certainly is not too much for a university to ask that its faculty members act professionally, engage in ethical conduct, be respectful, and maintain the highest level of integrity as required by Policy 600. Sneaking around and dropping-off anonymous flyers attacking a fellow professor falls short of such conduct, or so the university could reasonably conclude. Likewise, namelessly identifying a group as promoting hate without substantiating the allegation cuts against the promotion of the "free exchange of ideas" contemplated by Policy 007.

It is true, as Plaintiffs point out, that TTU has shown little in the way of actual harm. To the contrary, Dr. Donadio and Ms. Sciolis were so unfazed that they went on Fox television. That Plaintiffs unwittingly provided those two fodder for potentially spreading their ideas to a broader audience says nothing about the propriety of the university's reaction. Besides, "[s]chool officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place," even though "'forecasting disruption is unmistakably

18

difficult to do.'" Lowery v. Euverard, 497 F.3d 584, 596 (6th Cir. 2007).[5] It was reasonable for TTU to believe that, absent disciplinary action, Plaintiffs' speech would (1) disrupt its ability to fulfill its core mission of teaching students, given a university's "strong interest in preventing . . . speech that rises to the level of harassment," Bonnell, 241 F.3d at 824; (2) undercut its ability to enforce internal policies relating to employee conduct and free speech; and (3) diminish its obligation to protect all students' freedom of speech and a free marketplace of ideas.

Ultimately, "[t]he problem in any case," just as it is here, "is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. "Although such particularized balancing is difficult, [we] must reach the most appropriate possible balance of the competing interests." Connick, 461 U.S. at 150, 103 S.Ct. 1684. That balance tips in favor of Dr. Bruce and TTU and summary judgment will be granted in her favor on Plaintiffs' First Amendment retaliation claim.

**B.  Qualified Immunity and First Amendment Retaliation**

"Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." DiLuzio v. Vill. of Yorkville, 796 F.3d 604, 608 (6th Cir. 2015). "[C]learly established law should not be defined at a 'high level of generality' – it 'must be particularized to the facts of the case.'"

---

[5] The Court recognizes that Lowery involved the actions of a high school football coach in relation to his team. However, the notion that an employer can act when it reasonably believes an employee's speech is likely to interfere with the employer's mission applies to the governmental employer/employee relationship generally. See Millspaugh v. Cobb Cnty Fire & Emg, Servs., 2022 WL 17101337 at *7 (11th Cir. Nov. 22, 2022); Davis v. Billington, 51 F. Supp. 3d 97, 115 (D.D.C. 2014); Pappas v. Giuliani, 290 F.3d 143, 151 (2d Cir. 2002).

19

White v. Pauly, 137 S. Ct. 548, 552 (2017) (internal citations and quotation marks omitted). This does not require a plaintiff to identify an earlier decision that is "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting al–Kidd, 563 U.S. at 741). "[T]his narrow definition of 'clearly established' functions to protect 'all but the plainly incompetent or those who knowingly violate the law.'" Mitchell v. Schlabach, 864 F.3d 416, 424 (6th Cir. 2017) (quoting Mullenix, 136 S. Ct. at 308). It also serves to protect "reasonable" but "mistaken" decisions by officials acting in good faith. Hunter v. Bryant, 502 U.S. 224, 229 (1991).

Once the defense is raised, it is the plaintiff's burden to show "that the right was 'clearly established' at the time of the challenged conduct." al-Kidd, 563 U.S. at 735 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Plaintiffs have not met that burden here, although they attempt to do so in two ways.

First, Plaintiffs argue that qualified immunity is inappropriate based upon Connick because they "made their speech as private citizens (rather than professors at a university), and spoke about a matter of public concern (racism)." (Doc. No. 81 at 15-16). In Connick, while "the Supreme Court clearly established that racial discrimination is inherently a matter of public concern," Perry v. McGinnis, 209 F.3d 597, 608 (6th Cir. 2000), it did not establish that all speech by public employees touching upon matters of public concern is always acceptable. To the contrary, "[b]ecause of the enormous variety of fact situations," the Supreme Court found it "[n]either appropriate [n]or feasible to lay down a general standard against which all statements may be judged." Connick, 461 U.S. at 154. Indeed, a number of circuits have found that constitutional rights requiring a particularized balancing test will rarely be "clearly established" for qualified immunity purposes. See e.g., Nord

20

v. Walsh Cty., 757 F.3d 734, 740 (8th Cir. 2014) ("[I]f the evidence in the record is sufficient to proceed with the Pickering/Connick balancing exercise, this circuit has held that 'the asserted First Amendment right will rarely be considered clearly established.'"); Maggio v. Sipple, 211 F.3d 1346, 1354 (11th Cir. 2000) (citation omitted) ("Because the analysis of First Amendment retaliation claims under the Pickering–Connick test involve[s] legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules . . . a defendant in a First Amendment suit will only rarely be on notice that his actions are unlawful."); DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir.1995) ("[O]nly infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well-defined.")

> Second, Plaintiffs argue:
>
> Defendant also cannot establish the second element of her qualified immunity defense, because Plaintiffs' rights were clearly established at the time she issued the sanctions. Notably, Plaintiffs' first request for reconsideration was sent into Tech *before* Defendant determined and implemented the sanctions. In that letter, Plaintiffs' counsel explained in detail why the speech was protected under the First Amendment. This letter was sent on April 16th, 2021, *one month* before Defendant issued the sanctions.

(Doc. No. 81 at 16) (emphasis in original). However, the question is whether existing legal authority has placed the statutory or constitutional question beyond debate, and this is determined by looking first to Supreme Court precedent, then to Sixth Circuit precedent, and then to decisions of other courts of appeal. Barber v. Miller, 809 F.3d 840, 845 (6th Cir. 2015); Flint v. Kentucky Dep't of Corr., 270 F.3d 340, 347 (6th Cir. 2001). Respectfully, a 4-page opinion letter from attorney Robert C. Bigelow hardly makes the law clearly established.

To overcome the qualified immunity defense, it was incumbent upon Plaintiffs to show that any reasonable person in Dr. Bruce's position would know that discipline could not be meted out under the circumstances she encountered. "That's a tough standard. How tough? Well, [Plaintiffs'] must show that 'then-existing precedent' put the illegality of [Dr. Bruce's] conduct 'beyond debate.'" Ashford v. Raby, 951 F.3d 798, 801 (6th Cir. 2020). Because Plaintiffs have not done so, Dr. Bruce is entitled to qualified immunity in her individual capacity on Plaintiffs' First Amendment retaliation claim.

## C. Due Process and the Fourteenth Amendment

"The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a procedural due process claim, a plaintiff must establish that: (1) he has a property interest protected by the Due Process Clause; (2) he was deprived of this property interest; and (3) the state did not afford him adequate pre-deprivation procedural rights." Cahoo v. SAS Analytics Inc., 912 F.3d 887, 900 (6th Cir. 2019); accord Albrecht v. Treon, 617 F.3d 890, 894 (6th Cir. 2010).

As a preliminary matter, the parties dispute whether Plaintiffs were deprived of a property interest, which "are not created by the Constitution," but, instead, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]" Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 576 (1972)). Plaintiffs claim they were denied property interests when Dr. Gruber's grant was revoked, they were prohibited from study abroad trips, and they were subjected to random visits to their classroom by the Dean of the College of Arts and Science. According to them, these actions limited their professional growth, stunted their careers, and damaged their

22

reputation.

Plaintiffs rely on Smock v. Bd. of Regents of Univ. of Mich., 353 F. Supp.3d 651, 657 (E.D. Mich. 2018) for the proposition that "professors may have a protected property interest in their jobs duties if those responsibilities are essential to the employee's scholarship and academic standing." (Doc. No. 81 at 10).  Reliance on Smock is misplaced.  Not only was Smock decided in the context of a motion to dismiss, underpinning its property interests discussion was the Supreme Court's observation that "[t]o have a property interest in a benefit a person must clearly have more than an abstract need or desire and more than a unilateral expectation of it.  He must have a legitimate claim of entitlement to it."  Colorado v. Gonzales, 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005).  The plaintiff in Smock arguably had a property interest in sabbatical leave because there apparently was no discretion for the school to deny it, and arguably a property interest in his role as a graduate student advisor under his contract with the school, although that was less clear.  353 F. Supp. 3d at 656.  The same cannot be said here.

Undoubtedly, "government employees have a cognizable property interest in their job if they have tenure." Hasanaj v. Detroit Pub. Sch. Cmty. Dist., 35 F.4th 437, 448 (6th Cir. 2022).  Beyond that, and "[a]s a general rule, Sixth Circuit caselaw establishes that 'tenured university professors do not have a constitutionally protected property interest in administrative posts.'" Kaplan v. Univ. of Louisville, 10 F.4th 569, 579 (6th Cir. 2021) (citation omitted).  The Sixth Circuit recognizes "two potential exceptions to [its] general rule[:] [f]irst, a professor may have a property interest in an administrative position that is itself a tenure-track appointment; [or second], an express guarantee that the employee holds the administrative post subject to removal for cause might create a property interest." Id.  Both exceptions are in keeping with the Supreme Court's teaching that there must be

23

a legitimate claim of entitlement to the interest, and not just a desire, want, or need.

Plaintiffs have not shown a legitimate claim of entitlement to teaching abroad. To the contrary, Dr. Gruber's contract stated that there was "no obligation for or guarantee of summer session employment." (Doc. No. 88-2 at 4). Mr. Smith never participated in study abroad activities (Doc. No. 81-14, Smith Dep. at 168) and so he never had even a unilateral expectation of going overseas as a part of his teaching duties.

Dr. Gruber has also not established that she was denied a grant. What she was denied was a "Non-Instructional Assignment" for research that allowed her to take time away from her teaching duties. This apparently does not prevent her from applying for grants or other funding that would support her research and academic pursuits. (Doc. Nos. 81-13, Gruber Dep. 176-178; 62-22 at 3).

Nor has it been shown that the Dean auditing class is somehow the loss of a property interest. To the contrary, Mr. Johnson testified that "of course" the Dean has the privilege to "drop[] by my class." (Doc. No. 81-14, Johnson Dep. at 172).

"Only after a plaintiff has met the burden of demonstrating that he possessed a protected property or liberty interest and was deprived of that interest will the court consider whether the process provided the plaintiff in conjunction with the deprivation, or lack thereof, violated his rights to due process." Hamilton v. Myers, 281 F.3d 520, 529 (6th Cir. 2002). Because Plaintiffs have not carried that burden, the Court could end here. However, as a matter of completeness, the Court notes that Plaintiffs have not shown that they were deprived of adequate pre-deprivation procedures.

Plaintiffs complain that they were investigated under an inapplicable policy because, on February 24, 2021, they were informed that an investigation had commenced under Policy 141, Prohibited Discrimination and Harassment. However, the same letter to both Plaintiffs states that

24

Human Resources had received a complaint alleging misconduct in violation of Policy 202, Academic Freedom and Responsibility, Policy 207, Tenured Faculty, and Policy 600, Code of Conduct. (Doc. No. 80-8 at 1, 3). Those letters also plainly state, however, that the investigation would be conducted under the "*processes* set forth in Policy 141, Prohibited Discrimination and Harassment." (Id.) (emphasis added). In other words, Policy 141 provided the process for considering whether they violated the code of conduct set forth in Policy 600.

Next, Plaintiffs complain that Defendants overlooked or ignored information, including a "list of documented reports of TPUSA officials at college campuses across the country espousing racism," and Dr. Donadio's and Ms. Sciolis' participation in the Fox News program. (Doc. No. 80 at 14). Plaintiffs provide no cases suggesting that every kernel of information presented must be examined analyzed when determining discipline. This is likely because due process is a "flexible inquiry," with "[d]ifferent circumstances call[ing] for different processes." Cunningham v. Blackwell, 41 F.4th 530, 536 (6th Cir. 2022). "While "some kind of a hearing" generally must occur before the State fires a tenured employee . . . , the same is not true for other discipline." Id..

To succeed on their due process claim, Plaintiffs must show that they were denied "*adequate* procedural rights to protect against an erroneous deprivation." Kaplan, 10 F.4th at 577 (emphasis added). They have not done so. Quite the contrary, the record reflects that Dr. Bruce's was a considered decision. Investigator Holt notified Plaintiffs of the Complaint and the procedural process to be followed, reviewed relevant materials (the flyer, the police report, and the security images) and interviewed both witnesses and the Plaintiffs. He drafted an investigation report to Dr. Stinson who forwarded it to Dr. Bruce. Dr. Bruce then re-interviewed witnesses (Dr. Gruber, Mr. Smith, Ms. Sciolis, and Dr. Donadio), and reviewed the findings and investigative materials as well

as TTU policies. She also conferred with TTU's Faculty Senate President and Faculty Trustee before making her final decision regarding discipline. In short, Plaintiffs were provided all the process that was due.

Finally, Plaintiffs complain that their rights were somehow violated when Dr. Bruce rejected their appeal with the following three sentences:

> I received a formal written document appealing the disciplinary action related to Case # 2021-4 on June 17, 2021 via email from your lawyer, Mr. Robert Bigelow. I have carefully reviewed the appeal documents that were submitted on your behalf and I have also prudently reviewed the documentation related to the disciplinary action. I found that the appropriate TTU policy (Policy 650) was in fact followed and that the disciplinary action was reasonable and appropriate given the record.

(Doc. No. 81- 12 at 1). Not only do Plaintiffs cite no cases to support the proposition that a lengthy discourse is necessary when denying an appeal for reasons already given, they neglect to acknowledge that they were each sent a 3-page letter from Dr. Bruce on May 13, 2021 that discusses her rationale imposing certain discipline. Her rejection of the appeal required no further explanation.

### III. Conclusion

On the basis of the foregoing, Plaintiffs' Motion for Summary Judgment will be denied while Defendants' Motions will be granted. Further, because granting judgment in favor of Defendant means that Plaintiffs have no likelihood of success on the merits within the meaning of Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiffs' additional request for preliminary injunctive relief will be denied.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

# EXHIBIT "A"



This racist college professor thought it would be a great idea to help start a Tennessee Tech chapter for this national hate group, where racist students can unite to harass, threaten, intimidate, and terrorize persons of color, feminists, liberals, and the like, especially their teachers. Their organization created a national "Professor Watchlist" to harass and intimidate progressive educators, including many women, African-American, and Muslim professors.

Professor Donadio and Turning Point USA. You are on our list.
Your hate & hypocrisy are not welcome at Tennessee Tech.
No Unity With Racists.
Hate Speech Is Not Free Speech.